788 So.2d 23 (2000)
STATE of Louisiana
v.
Christopher JAMES.
No. 99-KA-1406.
Court of Appeal of Louisiana, Fourth Circuit.
July 19, 2000.
Writ Denied June 29, 2001.
*25 Harry F. Connick, District Attorney Orleans Parish, Susan Erlanger Talbot, Assistant District Attorney, New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
Christopher A. Aberle, Louisiana Appellate Project, Mandeville, Louisiana, Counsel for Defendant/Appellant.
Court composed of Judges CHARLES R. JONES, JAMES F. McKAY, III, and DENNIS R. BAGNERIS, Sr.
BAGNERIS, Judge.

STATEMENT OF THE CASE
On January 12, 1995, appellant Christopher James was charged in a grand jury indictment with one count of aggravated rape, one count of crime against nature and one count of aggravated burglary. On June 26, 1995, the trial court heard and denied motions to suppress. This court twice denied writs on those rulings. On November 29, 1995, at 95-K-2504, and on April 11, 1996, at 96-K-0603, this court refused to consider the merits of the applications, finding that the appellant had an adequate remedy on appeal if convicted. On June 21, 1996, at 96-KW-0603, the Louisiana Supreme Court also summarily denied the matter.
On August 21, 1996, following a three-day trial, a jury found the appellant guilty of aggravated rape and aggravated burglary. The jury was unable to reach a verdict on the crime against nature charge, and the court declared a mistrial as to that count. The State subsequently entered a nolle prosequi as to that count. The appellant was first sentenced on October 25, *26 1996 by an ad hoc judge. Thereafter, the State filed a motion advising the court that the ad hoc judge's term had expired prior to the sentencing, so that the sentencing judge was without proper authority to impose sentence on that date. Accordingly, on February 14, 1997, the current district judge resentenced the appellant to life imprisonment without benefit of probation, parole or suspension of sentence on the aggravated rape count and thirty years at hard labor on the aggravated burglary count, to run concurrently.
On June 7, 1999, the four-volume record was lodged in this court. On August 11, 1999, appellant, through appointed counsel, lodged his original brief. On September 21, 1999, the State filed its response. On September 27, 1999, appellant, through counsel, filed a reply brief. On September 30, 1999, the record was supplemented with the appellant's audiotaped statement, which was admitted at the trial.

STATEMENT OF THE FACTS
In the early morning hours of November 17, 1994, the victim saw the appellant, Christopher James, as she was walking home after visiting at the home of Frank Ashley, her former companion and father of two of her children. Ashley worked at a restaurant. The victim had gone to his home to see if he had brought home any food for her and her children. He had not. Though they argued over his support obligation, Ashley walked the victim part of the way home for her safety. When they were near the victim's home, she and Ashley saw the appellant. The victim was not concerned about him, as she had seen him around the neighborhood. Because they were arguing, the victim told Ashley that she was all right, that she could walk the rest of the way by herself, so he went back home.
The victim proceeded to her home, followed by the appellant, who pushed his way in the front door after her after she unlocked several padlocks. The appellant told the victim that he wanted "pussy." She was frightened, so she complied until the appellant would not quit. After awhile, the victim began to get physically irritated and tried to push the appellant off of her. This apparently angered the appellant. Over the next three hours, the appellant called the victim obscenities and threatened to kill her. In addition, he beat her in the head with his fist, a stick and a telephone, banged her head on the floor many times, attempted to strangle her with a telephone cord, and kicked her all over her body.
The victim pleaded with the appellant not to kill her because she needed to care for her baby, who was sick with sickle cell anemia. The victim testified that the appellant forced her to have oral and anal sex with him, causing her to urinate and defecate on herself. Finally, the victim thought to tell the appellant that her brother lived with her and would be coming home from work. The appellant then began to get dressed. After he got dressed, the appellant noticed the victim's television set and asked about it. She told him to take it.
The appellant had trouble getting the television set out of the wall until the victim explained that he had to unscrew the cable cord. Before the appellant left, he told the victim that he was going to kill her because she would report him to the police. He put a pillow over her face and stabbed her in her back, then walked out with the television set. He took her keys and locked the front door behind himself when he left, threatening to "finish [her] off' if she came out after him.
After the appellant left, the victim wrapped a sheet around herself and crawled out onto her back porch. She went down an alleyway, crawled over a *27 gate into her neighbor's yard, then proceeded another block and a half to her mother's house. The victim's mother called the police. The victim told the officers that she did not know her attacker's name, but knew that he lived in the little green house on an angle from the blue store. The victim further told them that she knew he played in a band because he told her so when she had previously seen him on Gravier Street with a tuba. She told the officers that Frank Ashley had seen him and knew where he lived.
The officers stopped by Ashley's house, and then Ashley went with them to the appellant's house and identified the appellant as the person he and the victim saw in the street shortly before the attack. The victim picked the appellant out of a photographic lineup later that evening, while she was in the hospital.
On cross-examination, the victim admitted that she had used crack cocaine, but had since overcome her drug addiction. In fact, it was when she purchased drugs that she had seen and talked to the appellant prior to the night of the attack. However, she testified that she did not use cocaine the day before the attack. Medical tests confirmed that the victim had no drugs in her system when she entered the hospital.
Dr. James Lee treated the victim at the hospital. She came in about 5:00 a.m. and was assigned to him when he came on duty at 7:00 a.m. Dr. Lee testified that the victim was "severely traumatized." He noted evidence of a severe beating, stabbing, and strangulation around her neck. The victim had difficulty speaking to him because her tongue was swollen, and she could not swallow. She also had lacerations inside of her mouth. The victim indicated to him that she had been beaten until she lost consciousness and had defecated and urinated on herself. She further told him that she had been strangled and that her face had been forced to the ground multiple times. She was placed in intensive care and stabilized first, then given the standard rape examination.
Officer Ronald White testified that he was called to the scene to assist the unit that was already at the victim's mother's home. The victim described where the perpetrator lived. Frank Ashley pointed out the appellant's house. When the appellant opened the door, Ashley identified him as the person who spoke to him and the victim earlier in the morning. Officer White testified that when he asked the appellant to step outside, he noticed dried blood on the side of his jaw. He then handcuffed the appellant and placed him in the police vehicle.
Officer White asked the appellant if anyone else was in the house. The appellant answered that there was not. The officer then asked if he could check this for himself. The appellant responded that he could. Once inside, Officer White observed tennis shoes that appeared to have blood on them and a television set. He also noticed that there was water in the bathtub. While there, the victim's mother and brother arrived and told Officer White that the perpetrator had taken the victim's television set. They then identified the television set in the appellant's house as the one belonging to the victim. The set was identifiable by paint on the extension cord.
Det. Joseph Lorenzo of the rape investigation unit went first to the victim's house, which was the scene of the attack. He testified that the front door was locked when he arrived. He entered through a side yard and the back door. He observed blood and feces on the floor, a knife in the threshold of the front door and another knife in the sofa in the living room. He also observed a bloody two-by-four piece of *28 wood, two bloody comforters and bloody women's clothing. Detective Lorenzo identified these objects at trial.
After viewing the scene of the attack, Officer Lorenzo proceeded to the residence of the appellant. From his observations at that scene, he identified the bloody tennis shoes found by Officer White, a bloody earring taken from off of the appellant, a photograph of the appellant with blood on his face, and a photograph of the seized television set.
Following the arrest, Officer Lorenzo took a statement from the appellant at the rape investigation office. The statement, witnessed in part by another officer, was read for the jury. In it, the appellant stated that he was on his way home from visiting his friend, Tyrus Chapman, who had just gotten into town. He further stated that he went to sleep after he got home, but awoke during the night to get something to drink. At that time, he remembered that it was garbage pickup the next day, so he put out his garbage. As he was going back inside, an unknown man asked him if he was interested in buying a television set. The appellant asked the stranger if it worked. The stranger let the appellant plug it into an outlet to check it out. The appellant then paid the man twenty dollars for the set. After the man left, the appellant decided to run water for a bath to cool off. He heard the officers knock at the door as he was getting a drink while running his bath.
When asked if he saw anyone else on the streets on the way home from his friend's house, the appellant stated that he saw the old man who identified him to the police. He further stated that the man was with a woman. He stated that the man whistled to him, and the woman walked up to him. The woman then asked him, "what's happening?" The appellant stated that he told her he was tired, then went home. He stated that the man said to the woman, "you got it?" and she replied, "yea, I got it." The appellant further stated that he saw the man walk towards the hotel. The appellant testified that he was not interested in the woman because she was "probably a crack smoker or something." He denied having seen either the man or the woman before that night. After taking the statement, Officer Lorenzo noticed the blood on the appellant's face and asked him about it. The appellant told him he did not know how it got there.
That evening, Officer Lorenzo went to the hospital, where the victim picked the appellant out of a photographic lineup. The victim was unable to speak clearly at that time, due to her swollen tongue and face, so he did a full interview at a later date.
R.J., the victim's brother, testified that he was at his mother's house when his sister, the victim, arrived. He testified that she was so swollen from the beating that he could hardly recognize her. The victim told them that the person who raped and beat her was the man who plays with the Rebirth Brass Band and lives in the green house near the blue store. He testified that officers heard him talking to his sister and followed him and his brother to the appellant's house as the ambulance and another police unit pulled up to his mother's house. The victim's brother further testified that the police kept him away from the appellant and out of the appellant's house for the appellant's protection. However, he testified that he could see his sister's television set, in the second room of the shotgun house, when the appellant opened the front door. He knew that the perpetrator had taken the television set and told one of the officers that he saw it in the appellant's house. The officers let R.J. take the television set home after they photographed it. R.J. admitted that he *29 was currently imprisoned for possession of PCP and had previous convictions for theft and mail fraud, but swore that he made no deal with the district attorney's office relative to his testimony in the instant case.
The victim's mother testified relative to her daughter's condition, that her face was swollen and her eyes were swollen shut. She further testified that her daughter told her that the perpetrator had taken her television set. The victim's mother went over to the appellant's house after her daughter was taken to the hospital. She also identified her daughter's television set to one of the officers. She recognized the set from the paint on the extension cord.
Frank Ashley testified that the victim is the mother of his two daughters. He further testified that when the victim's brother came to his house to tell him what happened, he went first to see the victim and talk to her. After the ambulance came, he went to the appellant's Gravier Street residence. He testified that he and the victim had seen the appellant earlier that morning, when he was walking the victim home from his house. He testified that he and the victim were arguing over child support when the appellant called out to them. He further testified that he asked the victim was she all right by herself from that point, to which she responded that she was. He then left her to return to his own house. He identified the appellant to one of the officers as the person who called out to him and the victim earlier that morning.
Patsy Daniels, a medical technologist with the coroner's office, performed the analysis of the rape kit obtained from the examination of the victim. She was unable to detect any blood groups from the vaginal or saliva samples taken from the victim. However, the vaginal swabs, both internal and external, were positive for seminal fluid. The anal and oral swabs were negative for seminal fluid and the smears were negative for spermatozoa. The victim's blood was found to be type 0. Ms. Daniels explained that if a person was a "strong secretor" and there was a sufficient sample, a blood group would be identifiable in swabs. She could not determine if the sample was of sufficient quantity because she was not present when the specimens were made. Her office does not do DNA testing.
Officer Timothy Seuzeneau is a forensic light examiner. He examines evidence for latent fingerprints using a fluorescent light. He examined the steak knife, the paring knife, and the phone cord from the victim's apartment, none of which had any prints. He noted that it is difficult to detect prints when something is covered in blood. He developed a partial fingerprint and a partial palm print on the telephone, but the prints could not be matched. The parties stipulated that Officer Glen Burmaster took fingerprints from the appellant and compared them to the prints from the telephone, and that the results were inconclusive.
Officer William Giblin testified that he found no foreign hairs in the combing from the victim's pubic hairs. He further testified that the swab of material taken from the left side of the appellant's face was "indicative" of blood, but it was not enough sample to type or group it. He obtained the same result from the substance on the defendant's earring. He found the defendant's shorts were negative for seminal fluid. Officer Giblin found only type 0 substances, the victim's blood type, on the victim's bra, t-shirt and slacks. The paring knife was positive for blood, but it could not be grouped as human blood or typed. The phone and phone cord were positive for human blood. The blood on the wooden board and wood fragments was *30 type O. The blood on one of the comforters from the victim's house tested positive for human blood. The other comforter tested positive for type O blood. The tennis shoes taken from the appellant's house tested positive for blood, but could not be grouped or typed. The blood test of the appellant indicated that he was a type B secretor. Officer Giblin noted that dirt or other things can cause a sample to be unsuitable for typing.
Angela Nevels, an employee of Campo's Appliance store, presented documentation, which indicated that the victim purchased a television set of the model that was seized from the appellant's apartment following his arrest.
Daisy Chapman, mother of Tyrus Chapman, testified that the appellant was at her house most of the afternoon and until late in the evening to see her son, who had just arrived from overseas. She testified that Tyrus had a newborn baby that was sick and in the hospital. She testified that she dropped the appellant off about two blocks from his house and took the others to the hospital. She further testified that the appellant called her between 12:30 and 1:00 a.m. to see if Tyrus had gotten home from the hospital.
The appellant's mother testified that she was at her own mother's house when she received a call from her landlord about the police being at her house. The landlord then picked her up and took her home. She testified that when she arrived, her son was in a police car, and the victim's mother and a young man were inside her house with the police. She further testified that the house had been thoroughly searched and all her closets, even a locked one, had been opened. She testified that when she asked to see a warrant, they told her that her son had consented to the search so they did not need one. She further testified that she washed her son's clothing following the incident and never noticed anything bloody or stained. She also testified that her son had a skin condition, which caused him to cut himself shaving on occasion. However, she testified that she saw no blood or injury on her son's face on the night of the incident. She also testified that one could not see the television set in the second room from the front door.
The defendant testified that when Ms. Chapman dropped him off on the way to the hospital, he saw a male and female in the neutral ground. He further testified that they called out to him. He further testified that the woman was trying to sell herself to him, and crossed over to him, while the man walked off. The woman asked him if he was in the mood for a date, but he was not. The appellant further testified that he went home and watched television, called Tyrus's house, then watched some more television until he dozed off. He testified that he woke up at about 3:00 a.m., when a gentleman came around with a television set in a shopping cart. The appellant asked if it worked. The gentlemen let the appellant plug the set in to see for himself. The appellant took the set and plugged the cord into the outlet in his mother's bedroom, which was the second room in the house. The appellant testified that he paid the man twenty dollars for the set.
The appellant testified that he then ran water in the bathtub intending to take a bath to cool off. He denied ever speaking to the victim or going to her house. He guessed that the blood on his face was probably from playing with Tyrus's children the previous evening.
The appellant testified that he weighed only 141 pounds when he was arrested, and was about 5'4" or 5'5" tall. The arrest register indicated that the appellant weighed 161 pounds and was 5'6" tall. *31 The appellant testified that he was not weighed or measured when he was booked. This issue was brought up because defense counsel suggested that the appellant was not large enough to have carried the television set the two blocks from the victim's house to his own.
On direct examination, the appellant admitted a single arrest for trespass. On cross-examination, he admitted additional arrests.

ERRORS PATENT
A review of the record for errors patent indicates that there were none.

ASSIGNMENT ONE
The appellant argues that the trial court erred in denying his motion to suppress evidence of the shoes and television set seized from the appellant's house. The right of every person to be secure in his person, house, papers, and effects, against unreasonable searches and seizures is guaranteed by the United States and Louisiana Constitutions. U.S. Const. Amend. IV; La. Const. Art. I § 5. The appellant maintains that because he was outside of his residence when he was arrested, the officers needed a search warrant to enter the premises absent one of the recognized exceptions to the warrant requirement. The State maintains that the circumstances of the case fit three of the recognized exceptions to the warrant requirement.
The first exception claimed by the State is that of consent. The State cites the testimony of Officer White, who testified that he asked the appellant if anyone else was in the house. The appellant responded that there was not, but said "yes" when the officer asked if he could go in and check for himself. The appellant denies that he ever consented to any search. The conflicting testimony on this issue is irrelevant. As noted by the State, the Louisiana Supreme Court sanctioned the ability of a police officer to conduct a protective sweep under similar circumstances in State v. Guiden, 399 So.2d 194, 199 (La.1981), which quoted from United States v. Agapito, 620 F.2d 324, 336 (2nd Cir.1980) as follows:
The reasonableness of a security check is simple and straightforward. From the standpoint of the individual, the intrusion on his privacy is slight; the search is cursory in nature and is intended to uncover only "persons, not things." United States v. Bowdach, 561 F.2d 1160, 1168 (5 Cir.1977). Once the security check has been completed and the premises secured, no further search be it extended or limited is permitted until a warrant is obtained. From the standpoint of the public, its interest in a security check is weighty. The delay attendant upon obtaining a warrant could enable accomplices lurking in another room to destroy evidence. More important, the safety of the arresting officers or members of the public may be jeopardized. Weighing the public interest against the modest intrusion on the privacy of the individual, Pennsylvania v. Mimms, 434 U.S. 106, 108-09[, 98 S.Ct. 330, 54 L.Ed.2d 331] (1977); Terry v. Ohio, 392 U.S. 1, 20-21[, 88 S.Ct. 1868, 20 L.Ed.2d 889] (1968), a security check conducted under the circumstances stated above satisfies the reasonableness requirement of the Fourth Amendment.
The officer was thus justified, with or without the consent of the appellant, to make a limited protective sweep to be certain that there was no one lurking in the residence who could destroy evidence or pose a danger to the officers or members of the public. The question thus is not whether or not the officer had consent to enter the premises for a protective *32 sweep, but rather did he exceed the scope of the permitted search. This is a fact question which is considered with the other exceptions, the "plain view doctrine" and the "inevitable discovery doctrine" claimed by the State.
Application of the plain view doctrine requires that the following conditions be met: (1) there must be a prior justification for an intrusion into a protected area, (2) in the course of which evidence is discovered inadvertently, and (3) where it is immediately apparent without close inspection that the items are evidence or contraband. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)[1]; State v. Brown, 370 So.2d 525 (La.1979). The inevitable discovery doctrine permits the admission of evidence found as a result of a violation of a defendant's constitutional rights, if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered. Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); State v. Nelson, 459 So.2d 510 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 322 (1985); State v. Clark, 499 So.2d 332 (La.App. 4th Cir.1986).
Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. Thus the police may inadvertently come across evidence while in "hot pursuit" of a fleeing suspect. Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Likewise, an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).
Finally, the "plain view" doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).
In the instant case, Officer White testified that he only briefly searched the premises to be certain that there were no other people there. He testified that he went through each room and also checked closets or anything in which a person could hide. He found a television set and tennis shoes, which appeared to have blood on them. Both were out in the open and in "plain view."
Considering that the victim was badly beaten and that the perpetrator answered the door with a bloody face, it was reasonable for the officer to assume that bloody tennis shoes were evidence of the crime. As to the television set, the appellant contends that the testimony of the victim's mother was inconsistent with the testimony of her brother. On the contrary, their individual testimony may be easily reconciled when considered in light of their testimony on the issue of when they arrived at the scene. The brother arrived at the scene at about the same time as the first police officer. He could see the television set from standing outside the front door and recognized that it was his sister's set. *33 He recalled what it was sitting on, and the room where it was located. He explained, as did several other State witnesses, that the appellant lived in a shotgun residence, and one could see into the second room from the front door. Officer White thus had reason to believe that the television set was incriminating evidence when he went through the house on his protective search.
The victim's mother arrived later, after the victim was taken to the hospital. An officer permitted her to come into the residence to confirm the identification of the television set. While this was an error, it did not affect the fact that the officer had already observed the television set in plain view and already had reason to believe that it was incriminating evidence.
The appellant's mother testified that the place was thoroughly searched, including a locked closet. Officer White admitted looking into closets under the auspices of a protective search. However, as noted by the State, the time frame of the officers' movements to the victim's mother's house, to the victim's house, to the appellant's house, to the police station, all within a couple of hours, belie the defense allegation that police officers made a lengthy and detailed search. Moreover, the items seized by the officer were not in a closet, but rather were out in the open.
The victim advised the officers and others of the perpetrator's whereabouts. The appellant opened the door with blood on his face. A witness identified the appellant as the person that he and the victim saw on the street shortly before the incident. Considering these facts, Officer White had probable cause to obtain a warrant to search the premises. Accordingly, the television set and tennis shoes would have inevitably been discovered, had they not already been seized pursuant to the limited protective search. This assignment is without merit.

ASSIGNMENT TWO
The appellant argues that he was denied effective assistance of counsel for the failure of counsel to object to the State's improper examination of his juvenile arrest record. Generally, only offenses for which the witness has been convicted are admissible upon the issue of credibility, and no inquiry is permitted into matters for which there has been only an arrest. La. C.E. art. 609.1(B).
To support a claim for ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that the deficiency prejudiced the defendant. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Fuller, 454 So.2d 119 (La.1984). Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Reed, 483 So.2d 1278 (La.App. 4th Cir.1986). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Garland, 482 So.2d 133 (La.App. 4th Cir. 1986).
If an alleged error falls "within the ambit of trial strategy" it does not "establish ineffective assistance of counsel." State v. Bienemy, 483 So.2d 1105 (La.App. 4th Cir.1986). Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined *34 by whether a particular strategy is successful." State v. Brooks, 505 So.2d 714, 724 (La.1987), cert. denied, Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
In this instance, the record is sufficient to review the claim on appeal. The appellant's mother testified that the appellant had never given "her" any trouble, and that he had never been convicted of anything. The appellant testified that he had never been in trouble before, but that he had been arrested once for trespassing when he ran into a hotel to use the bathroom. The State subsequently crossed-examined the appellant relative to four prior arrests.
The State argued that the defense opened the door to this examination because the appellant and his mother both testified that the appellant had never been "in trouble" before. The appellant contends that the use of the other arrests was improper impeachment. He notes that he did not testify on direct that he was arrested only once, but rather was asked by defense counsel on direct examination if he had "ever been in trouble before." He responded by testifying about the arrest for trespassing.
Defense counsel objected to the cross-examination, but only to interject, for the jury, that the appellant might have been charged for more than one offense in a single arrest. Counsel never requested a bench conference to object to the admission of the additional arrests into evidence.
It is irrelevant in this case whether the cross-examination on the appellant's arrests was proper impeachment, or whether counsel declined to object as a matter of trial strategy. These juvenile arrests on minor charges were insignificant when considering the evidence of serious injury inflicted upon the victim and the positive identifications of the appellant as the perpetrator. The introduction of the appellant's juvenile arrest record did not affect the verdict. This assignment is without merit.

CONCLUSION
Accordingly, the defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] In Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), the Court overruled Coolidge v. New Hampshire relative to the requirement of inadvertent discovery. In Arizona v. Hicks, 480 U.S. 321, 326-27, 107 S.Ct. 1149, 1153-54, 94 L.Ed.2d 347 (1987) the Court held that the third requirement for application of the plain view doctrine is that the police must have probable cause to believe that the item in plain view constitutes evidence of a crime.