LILJEBERG, J.
*1169 Defendant, Juan Salinas, appeals his convictions for possession with intent to distribute marijuana. Following the denial of defendant's motion to suppress evidence and statements, he entered into the guilty plea on May 18, 2017, under the provisions of State v. Crosby , 338 So.2d 584 (La. 1976), reserving his right to appeal the adverse ruling on the motion to suppress. For the following reasons, we reverse the trial court's denial of defendant's motion to suppress and enter an order denying the motion to suppress evidence and statements. We vacate defendant's conviction and sentence and remand the matter to the trial court.
PROCEDURAL HISTORY
Defendant, Juan Salinas, was arrested on February 1, 2015, along with defendant, Lance Cowans. On March 12, 2015, the St. Charles Parish District Attorney filed a bill of information charging defendant with possession with intent to distribute marijuana in violation of La. R.S. 40:966(A)(2). On April 7, 2015, defendant was arraigned and entered a plea of not guilty. On February 18, 2016, defendant filed motions to suppress evidence and statements. The State filed an opposition on July 29, 2016. On June 7, 2016, the trial court heard the motion to suppress and took the matter under advisement. The parties filed additional briefing and on September 7, 2016, the trial court denied the motion to suppress evidence and statements without reasons.
On May 18, 2017, defendant withdrew his plea of not guilty and pleaded guilty as charged pursuant to State v. Crosby , supra . In accordance with the plea agreement, the trial court sentenced defendant to five years imprisonment with the Department of Corrections. The sentence was deferred under La. C.Cr.P. art. 893, and defendant was placed on five years of active probation. At the conclusion of sentencing, defendant orally moved for an appeal of the denial of the motion to suppress, which was granted pursuant to the court minutes.[1] On May 30, 2017, defendant filed a written notice of appeal indicating he sought to appeal the trial court's denial of his motion to suppress, but he did not include an order for the trial court's signature. On July 19, 2017, defendant filed a second written notice of appeal with an order, which was granted on August 1, 2017.
FACTS
Because there was no trial, all facts were elicited at the hearing on the motions to suppress evidence and statements, which took place on June 7, 2016.
At the June 7, 2016 suppression hearing, Agent Christopher Kenny and Agent George Carcabasis with the United States Drug Enforcement Administration ("DEA") testified that, in late 2014, they were investigating a suspect, Ricardo Hernandez, alleged to be involved in drug trafficking between the Houston and the Greater New Orleans area. As part of this investigation, Agent Kenny used a reliable confidential informant ("CI") and, in October 2014, he monitored the CI's meeting with Hernandez and two unknown individuals in the parking lot of an Applebee's Restaurant in Kenner, Louisiana. The CI and other individuals discussed the purchase of a large quantity of cocaine to be *1170 delivered from Houston to a "stash house" near Baton Rouge. During the meeting, the original suspect indicated that defendant, one of the unknown individuals present at the time, was "the main guy in charge," and that his relatives owned the drugs. The original suspect also indicated defendant was present to make sure everything ran smoothly. Hernandez and the other individuals wanted the CI to show or provide them with money before they would deliver the drugs. This did not occur and the agents did not see any drugs or money exchanged during the meeting.
The agents similarly testified that following the meeting, they maintained surveillance of the vehicle, a blue Ford F-150 truck with a Texas license plate, containing Hernandez and the two other unknown individuals. Agent Kenny ran the license plate and learned that the vehicle was registered to defendant. Officers observed the vehicle go to 836 Fox Lane, a residence in St. Rose in St. Charles Parish, later determined to be the home of defendant, Lance Cowans, who was arrested with defendant. The residence was located on a dead-end street in an area where mostly families lived. The suspects stayed at the residence for only 15 to 20 minutes. Next, they drove to a parking lot at a nearby restaurant and sat in the truck for approximately an hour. Agents then observed the truck return to Fox Lane for 15 minutes. An undercover agent observed flashlights around the residence and shed area behind the residence.
Agent Kenny testified that the Fox Lane residence was previously unknown to them, but after their surveillance they suspected it was a stash house for drugs. The truck and the men then drove away on I-10 heading west. Agents maintained surveillance on the truck in order to determine whether the suspects would stop at a stash house in Baton Rouge. When the truck passed the Baton Rouge area, they requested that a local police unit stop the truck in West Baton Rouge Parish in order to identify the occupants. During the stop, agents learned defendant's identity. No one was arrested, the vehicle was not searched, and the agents ceased surveillance. Because they believed the truck may be used for drug trafficking in the future, agents entered the truck's license plate number into the Louisiana license plate camera recognition system maintained by the Louisiana State Police. The system would alert the agents if the truck returned to Louisiana.
Several months later, on February 1, 2015, the agents received an email alert indicating the truck was travelling eastbound on I-10 near Lake Charles. Agent Kenny testified that they assumed the truck would return to Fox Lane as this was the only previous place they saw the truck visit. He and Agent Carcabasis attempted to locate the truck on the interstate, but they were unsuccessful. Agent Carcabasis contacted the St. Charles Parish Sheriff's Office ("SCPSO") for assistance. They provided the vehicle's description and license plate information. They also informed the SCPSO that the truck was possibly a "load vehicle" (one used to transport narcotics) and that, based on prior surveillance, it might be headed to Fox Lane.
Sergeant Paul Walker of the SCPSO was on patrol when he observed the truck and its driver near Fox Lane at a Brother's Food Mart. Sgt. Walker then alerted the other units that he saw the vehicle drive down Fox Lane. The DEA agents met with Detective Allan Tabora of the SCPSO, as well as other SCPSO officers, in an empty parking lot near the intersection of Fox Lane and Airline Highway. As the group discussed their next move, several officers observed the truck disregard *1171 a stop sign at the intersection of Airline Highway and Fox Lane.
Detective Tabora and Detective Danny April with the SCPSO performed a traffic stop. Agents Kenny and Carcabasis spoke with defendant. Agent Kenny testified that defendant related that he travelled from Houston, stopped to eat at Ruth's Chris Steakhouse in Baton Rouge, visited his friend on Fox Lane for about 15 to 20 minutes, and was headed back to Houston. Agent Kenny thought that it was odd that someone would drive for hours to see a friend and stay for only 15-20 minutes. He also testified that he noticed defendant's hands were shaking and very dirty. Defendant explained that his front tire was "messing up" and he had to fix it. Agent Kenny testified that he observed the tire and it appeared to be fine. Agent Kenny described defendant's demeanor as "very nervous."
Detective Tabora also spoke with defendant and testified that he was nervous and stuttering. He asked defendant when he arrived in St. Rose and defendant responded noon; however, Detective Tabora noted that it was only 11:45 a.m. when they made the traffic stop. Defendant provided his license, insurance, and proof of registration, and eventually, he was asked to step out of the truck. Detective Tabora testified that six law enforcement officers were present at the traffic stop, including four SPCSO officers and two DEA agents.
Detective Tabora testified that, based on the information provided by the DEA agents, as well as defendant's nervous behavior and statements regarding his travel itinerary, he requested a canine to perform an open-air sniff of the truck.[2] Detective Tabora testified that defendant then provided consent to search the truck. During the search, the agents and officer located several items, which they explained were commonly used to attempt to conceal the odor of illegal drugs. They located an excessive amount of fabric softener sheets in the center console, in a pocket behind the front seat and in the back seat. They also found coffee grinds throughout the truck and fish remains in the bed of the truck. They did not find any illegal drugs.
According to Detective Tabora, several officers relocated to the Fox Lane residence during the traffic stop to further investigate. Based on the items found in the truck during the traffic stop, as well as defendant's statements and demeanor, defendant was detained in handcuffs and placed in the back of a unit pending the outcome of the investigation at Fox Lane. Detective Tabora testified that defendant was advised of his Miranda[3] warnings at some point either on Airline Highway or shortly thereafter.
Meanwhile, after receiving a briefing of the ongoing events at the scene of the traffic stop, Lieutenant Marlon Shuff and Sergeant Bradley Walsh with the SCPSO went to 836 Fox Lane, along with other detectives and patrol officers in their division, to continue the investigation by conducting a "knock and talk" at the residence. Lt. Shuff knocked on the door of the residence, but no one answered. A short time later, Cowans exited the residence located next door and identified himself.[4] Lt. Shuff recalled that he could immediately tell Cowans was nervous and he asked him if they could go inside the residence, but Cowans declined, stating they *1172 could talk in the front yard. Lt. Shuff testified that he and Cowans were located in an area between Cowan's house and the neighboring property, and the two houses were very close to one another.
Sgt. Bradley Walsh, with the SCPSO special investigations division, testified that he also left the traffic scene to go to Fox Lane and attempt contact with the homeowner. Sgt. Walsh witnessed another officer knock at the door, but no one answered. At that point, he saw Cowans come out of the neighbor's residence next door, where Lt. Shuff made contact with him. Sgt. Walsh started walking towards them. As he got closer to them, he could see between the two residences and saw what appeared to be a garage behind Cowans' house. He continued to walk towards the backyard of the residence and saw the structure had multiple bays with roll-up doors, which were open.
Sgt. Walsh explained that he went to the back structure to do a protective sweep to make sure no one else was in the area behind the residence. He agreed on cross-examination that he had no information anyone else was at the residence as defendant told the officers he was the only one at the residence. Sgt. Walsh testified that in any type of investigation, it was common practice to do a protective sweep of the area for officer safety.[5] He agreed that Cowans did not give him permission to do the sweep of his backyard, nor did he ask. Sgt. Walsh agreed he had no reason to believe a dangerous person might be present and officers did not have probable cause to obtain a search warrant for the Fox Lane residence at that time.
As Sgt. Walsh approached one of the open garages, he noticed a tire sitting upright two to three feet inside of the entrance to the garage. He could see that a section of the tire had been cut out. He could also see a "sawzall" lying next to the tire, as well as freshly cut rubber from the tire. He testified that, as he stood outside the garage, he could see the "gleanings of vegetable matter" throughout the inside of the tire. On cross-examination, he admitted that he first saw discolored matter inside the tire and had to enter the garage in order to determine that it looked like marijuana. He returned to the front yard to advise Lt. Shuff regarding what he observed in the garage. Lt. Shuff went into the backyard and into the garage and, upon close inspection of the tire, observed a small amount of green vegetable matter, which field tested positive for marijuana.
Sgt. Walsh helped take photographs of the premises that day, which he identified in court.[6] He agreed that the marijuana gleanings he saw inside the tire were not depicted in the photographs. The garage structure in the photographs had a concrete floor that did not extend or connect to a driveway outside of the structure. The driveway in the front of the house led into an enclosed carport. The garage in the back of the property was not visible from the front door or the driveway in the front of the property.[7]
*1173 Lt. Shuff testified that, based on the information received from the DEA, the traffic stop and the discovery of the tire containing the green vegetable matter, they approached Cowans and told him they were securing his residence in order to obtain a search warrant. Cowans cooperated and after unlocking the door, restrained his two dogs, which were inside. The officers then conducted a protective sweep of the inside of the residence.
Once inside the residence, Lt. Shuff and Sgt. Walsh both testified to smelling a strong odor of marijuana. As Sgt. Walsh walked down the hallway towards the bedrooms, another officer came out of the last bedroom and reported finding a large amount of marijuana in the shape of a tire. Cowans was arrested and Mirandized after the marijuana was found in the house. After the officers spoke with Cowans inside the residence, he indicated that defendant had "just dropped off" drugs. Defendant was then placed under arrest.
Detective Tabora testified he arrived at 836 Fox Lane approximately 15 minutes after Sgt. Walsh and Lt. Shuff left for the residence. Once he arrived, the officers briefed him on what they found during the protective sweep. Additionally, Detective Tabora observed packaging material and a digital scale inside the residence. Detective Tabora testified that he was the one who prepared an application for a search warrant, which included the findings from the protective sweep of the garage and residence. Detective Tabora, Lt. Shuff, and Sgt. Walsh testified that additional narcotics, including cocaine, steroids, and pills, as well as firearms, were found after the search warrant was executed. Following execution of the search warrant, defendant admitted that he delivered narcotics to 836 Fox Lane in the past and was paid $1,200. He stated that he was paid $1,000 to deliver the marijuana seized from Cowans' house.
ANALYSIS
In his sole assignment of error, defendant contends the trial court erred by denying the motion to suppress the evidence and statements because the officers erroneously arrested him without probable cause and then brought him to Cowans' house. He also argues his detention was "unabashedly pretextual" and constitutionally unjustifiable based on the traffic violation. Defendant also challenges the protective sweep of Cowans' residence and its curtilage as violative of the Fourth Amendment because of the lack of exigent circumstances. He argues that the evidence (marijuana inside a shed in the backyard) was not inevitably discovered, nor did any exclusionary rule exception apply.
The State contends that law enforcement officers had the right to stop and detain defendant since he was the subject of an on-going DEA investigation of drug trafficking between Houston and New Orleans and was suspected of being the point person. The State argues that, once officers observed defendant running a stop sign, the officers had the right to stop him and detain him pursuant to La. C.Cr.P. art. 215.1 and Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), since defendant appeared nervous and considering the inconsistent accounts of his travel plans. The State notes that defendant consented to a search of his truck, which led to the discovery of items known for masking the odor of narcotics. The State further argues that the officers had the right to ensure their safety during the investigation that justified the protective sweeps and that defendant had no reasonable expectation of privacy in Cowans' home.
The right of every person to be secure in his person, house, papers and *1174 effects against unreasonable searches and seizures, is guaranteed by the Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution. State v. Ables , 16-538 (La. App. 5 Cir. 2/8/17), 213 So.3d 477, 482, writ denied , 17-488 (La. 11/28/17), 230 So.3d 221 ; State v. Flagg , 99-1004 (La. App. 5 Cir. 4/25/00), 760 So.2d 522, 526, writ denied , 00-1510 (La. 3/9/01), 786 So.2d 117. In an effort to discourage police misconduct in violation of these standards, if evidence is derived from an unreasonable search or seizure, the proper remedy is to exclude the evidence from trial. State v. Tucker , 92-2093, 92-2130 (La. 5/24/93), 626 So.2d 707, 710 ; Ables , supra . The exclusionary rule bars, as illegal fruit, physical and verbal evidence obtained either during or as a direct result of an unlawful invasion. The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of illegality, or fruit of the poisonous tree. State v. Nicholas , 06-903 (La. App. 5 Cir. 4/24/07), 958 So.2d 682, 686-87. A defendant who is adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained. La. C.Cr.P. art. 703(A).
Ultimately, the State bears the burden to show that a warrantless search falls within one of the exceptions to the rule that a warrantless search is per se unconstitutional. Ables , supra ; Flagg , supra. In a hearing on a motion to suppress, the State bears the burden in establishing the admissibility of the evidence seized without a warrant. La. C.Cr.P. art. 703(D) ; State v. Butler , 13-850 (La. App. 5 Cir. 5/28/14), 142 So.3d 306, 312. When evidence is seized pursuant to a search warrant, the defendant bears the burden of proof at a hearing on his motion to suppress that evidence. La. C.Cr.P. art. 703(D) ; State v. Cortez , 11-1041 (La. App. 5 Cir. 5/22/12), 98 So.3d 382, 391. The trial court's denial of a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression. Ables , supra .
The right of law enforcement officers to stop and interrogate those reasonably suspected of criminal activity is recognized by state and federal jurisprudence, and is codified in La. C.Cr.P. art. 215.1. Terry , supra ; State v. Belton , 441 So.2d 1195 (La. 1983), cert. denied , 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). Reasonable suspicion is something less than probable cause to arrest, and requires that police officers have sufficient knowledge of facts and circumstances to justify an infringement of the individual's right to be free from government interference. State v. Chauvin , 06-362 (La. App. 5 Cir. 10/31/06), 945 So.2d 752, 757-758.
Generally, the decision to stop a vehicle is reasonable when the police have probable cause to believe a traffic violation has occurred. Whren v. United States , 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Police officers may make an initial traffic stop after observing a traffic infraction, even if the stop is a pretext to investigate for controlled dangerous substances. State v. Lewis , 12-902 (La. App. 5 Cir. 6/27/13), 121 So.3d 128, 135, writ denied , 13-1926 (La. 4/17/14), 138 So.3d 618. The standard is purely objective and does not take into consideration the subjective beliefs or expectations of the detaining officer. State v. Waters , 00-356 (La. 3/12/01), 780 So.2d 1053, 1056 (per curiam).
Although they may serve, and may often appear intended to serve, as the prelude to the investigation of much more serious offenses, even relatively minor *1175 traffic violations provide an objective basis for lawfully detaining the vehicle and its occupants. State v. Bardell , 17-274 (La. App. 5 Cir. 11/15/17), 232 So.3d 82, 88 ; State v. Davis , 09-452 (La. App. 5 Cir. 1/26/10), 31 So.3d 513, 517, writ denied , 10-2201 (La. 10/21/11), 73 So.3d 373. Once an officer has lawfully stopped a vehicle for a routine traffic violation, he is authorized to order both the driver and passengers out of the vehicle pending completion of the stop. Butler , 142 So.3d at 312.
In the instant matter, several officers observed defendant run a stop sign, a violation of La. R.S. 32:231, near Airline Highway and Fox Lane. As such, the officers were justified in stopping defendant for the traffic violation and ordering him out of the vehicle. Even if the officers' subjective intent was to investigate defendant on suspicions of drug trafficking, the traffic stop was nonetheless lawful.
La C.Cr.P. art. 215.1(D) provides that in conducting a traffic stop "an officer may not detain a motorist for a period of time longer than reasonably necessary to complete the investigation of the violation and issuance of a citation for the violation, absent reasonable suspicion of additional criminal activity." If the police officer has a specific suspicion of criminal activity, he may further detain the individual or the property while he diligently pursues a means of investigation likely to quickly confirm or dispel the particular suspicion. United States v. Sharpe , 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) ; State v. Cooks , 12-237 (La. App. 5 Cir. 1/30/13), 108 So.3d 1257, 1269, writ denied , 13-0454 (La. 9/20/13), 123 So.3d 164.
In this particular case, based on the prior investigation, which showed defendant in the company of the CI in October of 2014, discussing drug trafficking, coupled with the prior surveillance which had shown the vehicle to visit Fox Lane in October of 2014, as well as defendant's nervousness and odd travel itinerary relayed to officers during the February 1, 2015 traffic stop, the officers had reasonable suspicion of criminal activity to justify defendant's continued detention. Following the consent search of the vehicle, which revealed the items noted above commonly used by drug traffickers to prevent the detection of the odor of narcotics, the officers' suspicion of criminal activity was heightened. We, therefore, find that defendant's original and continued detention were lawful.
Defendant also challenges the constitutionality of the "protective sweep" of the garage at 836 Fox Lane, which was a warrantless search, as well as the protective sweep of Cowans' home. A defendant adversely affected by the search of a home of another has standing under the Louisiana Constitution to assert a homeowners' loss of privacy rights. State v. Gant , 93-2895 (La. 5/20/94), 637 So.2d 396, 397 ; State v. Talbert , 449 So.2d 446, 448 fn.1 (La. 1984) ; State v. Owen , 453 So.2d 1202, 1205 (La. 1984).
A "protective sweep" is an exception to the general warrant requirement of the Fourth Amendment. A protective sweep is "a quick and limited search of the premises ... conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie , 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). In order to conduct a protective sweep, the searching officer must possess a "reasonable belief based on specific and articulable facts" which, taken together with the rational inferences from those facts, reasonably warrants the officer to believe the area swept "harbors an individual *1176 posing a danger to those on the arrest scene." Id. at 337, 110 S.Ct. 1093. The legitimate protective sweep may not be "a full search," but may be no more than "a cursory inspection of those spaces where a person may be found." United States v. Gould , 364 F.3d 578, 587 (5th Cir. 2004), cert. denied , 543 U.S. 955, 125 S.Ct. 437, 160 L.Ed.2d 317, quoting Maryland v. Buie, 110 S.Ct. at 1099.
In Buie , the Supreme Court held that the Fourth Amendment to the United States Constitution permits a limited protective sweep in conjunction with an in-home arrest:
... as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.
Buie , 110 S.Ct. at 1098.
Subsequent cases have authorized the use of protective sweeps in scenarios other than as an incident to an arrest. See Gould , supra . However, in order for the protective sweep to be valid when an arrest or search warrant is not involved, officers must enter the premises legally and for a legitimate law enforcement purpose and must have a reasonable, articulable suspicion that the area to be swept contains a person posing a danger to those on the scene. Gould , 364 F.3d at 587 ; see also State v. Hilton, 16-325 (La. 3/24/16), 187 So.3d 981, 983 ("police acted reasonably while in places they were lawfully entitled to be."). Furthermore, in Nicholas , 958 So.2d at 689, this Court noted that a protective sweep conducted solely as a matter of standard procedure or policy was not warranted, but rather must be accompanied by additional exigent circumstances necessitating a sweep.
Warrantless entries into the home for arrest or seizure are invalid in the absence of exigent circumstances. Payton v. New York , 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Exigent circumstances may arise from the need to prevent the offender's escape, minimize the possibility of a violent confrontation which could cause injury to the officers and the public, and preserve evidence from destruction or concealment. State v. Brisban , 00-3437 (La. 2/26/02), 809 So.2d 923, 927-28.
The scenario at issue before this Court involves a "knock and talk." A "knock and talk" is a law enforcement tactic where police officers, who possess information they believe warrants further investigation but is insufficient to constitute probable cause for a search warrant, approach the person suspected of engaging in illegal activity at the person's residence, knock on the front door, identify themselves as police officers, request consent to talk to the individual about the alleged illegal activity and request permission to enter the premises. State v. Warren , 05-2248 (La. 2/22/07), 949 So.2d 1215, 1221-22. In Warren , the Louisiana Supreme Court noted "[t]he prevailing rule is that, absent a clear expression by the owner to the contrary, police officers, in the course of their official business, are permitted to approach one's dwelling and seek permission to question an occupant." Id. at 1222.
In the instant matter, officers did not possess any information regarding the occupants of the Fox Lane residence, other than that a suspected *1177 drug trafficker visited the property for brief periods on two prior occasions. Officers knocked on the door and no one responded. Cowans then exited a neighboring property and identified himself. When officers asked to enter the Fox Lane residence, Cowans declined and told officers they could speak on the front lawn of his property. Therefore, at that point, officers had no right to further entry onto Cowans' property without the existence of exigent circumstances. As noted above, standard procedure and policy for officer safety is not sufficient to create exigent circumstances to allow officers to gain lawful entry into a private residence.[8] Furthermore, officers cannot manufacture exigent circumstances by deciding to conduct a knock and talk at a residence. Warren , 949 So.2d at 1225 ("Exigent circumstances, however, do not meet Fourth Amendment standards if the government deliberately creates them.").
The following cases present examples of situations where officers gained lawful entry to premises after approaching a residence to conduct a knock, and further illustrate the circumstances allowing officers to proceed with a protective sweep. In Hilton , 187 So.3d at 982-84, the Louisiana Supreme Court reversed the trial court's ruling suppressing evidence seized following the execution of a search warrant predicated upon drug and firearm evidence observed during a protective sweep. The officers received a Crimestoppers' tip regarding narcotics activity at a residence. Officers approached the front door of the residence only to find that it was chained shut. While at the front door officers detected the smell of marijuana. Officers decided to further investigate and observed an accessible side entrance through an open gate leading to the backyard. Officers knocked and announced their presence at the side door and heard a commotion going on inside. Once someone opened the side door, the officers observed a dimly lit area and continuing commotion involving several individuals. The Supreme Court found that based on the detection of the smell of marijuana and the commotion inside the residence, the officers were reasonable in directing the individuals to exit, detaining them, and conducting a protective sweep for officer safety and to prevent the destruction of evidence. Thus, it held that the search warrant was not tainted by the evidence located during the protective sweep. Id.
In Gould , supra , after receiving a tip that the defendant, a known violent felon, was planning to kill two judges, sheriff's deputies went to the defendant's home to talk to him. Upon arriving at the residence, *1178 the deputies were granted permission to enter the home by a co-resident of the home, who indicated the defendant was located in the back bedroom. The deputies approached the bedroom, but were unable to ascertain the defendant's precise location. Consequently, the officers conducted a protective sweep of the room, looking under the bed and opening the doors to each of the two bedroom closets. During the sweep, the deputies noted the presence of three rifles in one of the closets, but they did not seize them at that time. The court upheld the validity of the sweep of the residence, noting that the police officers, who only intended to talk to the defendant, had a right to be inside the residence because they had the permission of a resident of the home. Id. at 589-90.
In State v. Guiden , 399 So.2d 194 (La. 1981), after a warrant was issued for the defendant's arrest for an attempted armed robbery and shooting, police officers received information that the defendant and an accomplice were hiding at a motel. The officers proceeded to the motel, surrounded the room where the two suspects were believed to be located, announced their presence, and ordered the occupants of the room to come outside. The defendant and another individual (not the alleged accomplice) emerged from the room and were immediately placed under arrest. Since the accomplice had not appeared, the officers entered the motel room to see if he was hiding there. Once inside, one of the officers went into the bathroom to check for the presence of the accomplice and noticed a revolver in the open commode. At that point, the officer secured the room and left to obtain a search warrant. The search conducted pursuant to the warrant resulted in the retrieval of the weapon from the commode.
The Guiden court noted that the officers had arrest warrants for individuals wanted in connection with the shooting and attempted armed robbery, and it was expected that the suspects were armed and dangerous. Additionally, since only one of the suspects came out of the motel room, the police officers had reason to believe that the other wanted individual was still in the room. Therefore, the court concluded that there was prior justification for intrusion into the motel room, and the weapon was inadvertently discovered in plain view. Id. at 199.
In State v. Narcisse , 01-49 (La. App. 5 Cir. 6/27/01), 791 So.2d 149, writ denied , 01-2231 (La. 6/14/02), 817 So.2d 1152, after responding to a call regarding a burglary complaint, police officers learned that the two suspects were in a brown car around the corner from the scene of the incident. The victim identified the defendant as one of the suspects. The officers spotted a brown car near an apartment complex and began to knock on apartment doors. As one of the officers knocked on an apartment door, the defendant came out of another apartment several doors down and indicated that he was the resident of the apartment where the officers were knocking. At that point, the defendant was placed under arrest. As the officer was arresting the defendant, he heard a noise inside of the defendant's apartment. He looked inside and saw the other suspect running out of the back sliding glass door, and the other officer pursued him. During a security check of the apartment, one of the officers observed bags of marijuana and a handgun lying on a bed in an upstairs bedroom. The narcotics division was called to the scene, and the defendant consented to a search of his apartment. The court upheld the validity of the search stating, "[c]onsidering that both suspects were in defendant's apartment before the police arrived, and one fled through the back door, a security check of the apartment *1179 to determine if anyone else was inside was certainly justified." Id. at 153.
In State v. Robichaux , 00-1234 (La. App. 4 Cir. 3/14/01), 788 So.2d 458, writ denied , 01-1177 (La. 3/15/02), 811 So.2d 897, cert. denied , 537 U.S. 839, 123 S.Ct. 157, 154 L.Ed.2d 60, police officers received a tip regarding "trouble" at an apartment on North Tonti Street in New Orleans. As the police officers approached the apartment, they noticed drops of blood on the ground and rear porch, and they heard someone moaning inside. The victim, who was partially clothed and bleeding from the head, met the officers at the back door and informed them that she had been attacked with a hammer, raped, and tortured over a period of several hours. She identified the defendant as her assailant. The officers performed a sweep of the apartment and found a hammer. The court held that the search of the residence and the seizure of the hammer were valid stating, "[t]he officers were thus justified to make a limited sweep of the premises to verify that there was no one else in the residence who could have posed a threat to the officers or who could have destroyed evidence." Id. at 468.
In State v. Jefferson , 13-703 (La. App. 4 Cir. 4/16/14), 140 So.3d 235, 241-43, writ denied , 14-2062 (La. 9/18/15), 178 So.3d 138, officers obtained a tip from an untested confidential information regarding drug activity at a residence. Officers learned that the owner of the vehicle in the driveway had a history of drug offenses. Officers decided to conduct a knock and talk. The defendant answered the door and agreed to allow the officers inside to talk. Officers smelled the odor of marijuana upon entering the defendant's home and heard a commotion and dogs barking in the back of the residence. The officers decided to conduct a protective sweep and found cocaine on a counter in the master bedroom, which officers used to obtain a search warrant. Based on the detection of marijuana odor and the commotion officers heard, the Fourth Circuit determined the trial court did not err in finding that the agents were justified in their belief that the threat to officer safety created an exigency warranting a protective sweep. Id. at 243.
In State v. James , 99-1406 (La. App. 4 Cir. 7/19/00), 788 So.2d 23, writ denied , 00-2473 (La. 6/29/01), 794 So.2d 822, during an investigation of allegations of aggravated rape, crime against nature and aggravated burglary, the victim informed the police officers of the perpetrator's identity and told them where he lived. When officers arrived at the defendant's house, the defendant opened the door. At that point, the officers noticed dried blood on the side of the defendant's jaw and placed him under arrest. The officer asked the defendant if anyone else was in the house, and the defendant responded in the negative. The defendant then gave the officer permission to check the house for himself. Once inside, the officer observed shoes with what appeared to be blood on them and a television set. He also observed water in the bathtub. While the officer was still inside of the house, the victim's mother and brother arrived and told the officer that the perpetrator had taken the victim's television set and identified the television set as belonging to the victim. Noting that the defendant had consented to the search of his residence, the court stated, "[t]he officer was thus justified, with or without the consent of the appellant, to make a limited protective sweep to be certain that there was no one lurking in the residence who could destroy evidence or pose a danger to the officers or members of the public." Id. at 31.
In United States v. Howard , 106 F.3d 70, 73-75 (5th Cir. 1997), the United States Fifth Circuit upheld a finding that exigent *1180 circumstances justified a warrantless entry into the home of a suspected drug dealer. In that case, DEA agents had credible information that the defendant's house was a stash house. DEA agents surveilled the house over a seventh-month period and witnessed evidence of drug activity. They later arrested an individual coming out of the defendant's house who agreed to cooperate with the agents and who advised the agents that the defendant was storing drugs in the house and that the defendant expected him to return to the house with a kilogram of cocaine. During the surveillance, police stopped a vehicle leaving the defendant's house within view of the residence. A crowd gathered and police were concerned defendant would see the police activity and attempt to destroy evidence. Therefore, police decided to knock on the door and arrest defendant. They then did a protective sweep of the home. The court held that the warrantless entry into the defendant's house was justified under the circumstances to prevent the destruction of evidence. Id. at 79.
All of the above referenced cases are distinguishable from the instant matter. In Gould , Jefferson, and Robichaux , the officers were granted permission to enter the residence by someone who lived at the residence. In Guiden , the officers secured a warrant for the defendant's arrest and for the arrest of an accomplice who did not exit the room when ordered to do so and was presumed to have been still in the room. In James and Howard , the sweep of the residence was incident to the defendant's arrest, and the James defendant granted the officers permission to search his house. In Narcisse , officers entered the residence after they saw blood outside the home and encountered a bleeding victim at the back door of the home. In Hilton , officers smelled marijuana outside of the home and heard an ongoing commotion inside of the residence after they knocked on the door and announced they were police officers.
The dissenting opinion provided below in the instant matter refers to State v. Doussan , 05-586 (La. App. 5 Cir. 2/14/06), 924 So.2d 333, in support of its position to uphold the trial court's denial of the motion to suppress evidence and statements. This case is clearly distinguishable from the present matter. In Doussan , officers applied for a warrant to search a music studio, not a residence, based on information obtained from a confidential informant (CI) who purchased marijuana from the owner of the studio in the past and who indicated a fresh supply of marijuana was available at the studio. Prior to obtaining the warrant, officers established surveillance and instructed the CI to make an additional purchase, which tested positive for marijuana. The surveillance team witnessed three other people enter and leave the studio, one of whom officers stopped and found to be in possession of marijuana. The officers also witnessed the owner repeatedly enter and exit the studio and feared one of the visitors may have alerted the defendant to the surveillance. Officers decided to approach the defendant, who was outside the studio. The defendant fled into the studio and locked the door. Officers pounded on the door and defendant allowed officers to enter. Officers then conducted a protective sweep of the studio and learned 10 to 15 minutes later that the search warrant was signed. The Doussan court upheld the protective sweep because the officers could not have known if anyone else was in the studio. Id. at 342-43. The Doussan case is obviously distinguishable from the present matter based on the exigent circumstances created by the criminal actions witnessed by the officers during their surveillance, the defendant's behavior and the fear their surveillance was detected and evidence may be destroyed.
*1181 State v. Ledford , 40,318 (La. App. 2 Cir. 10/28/05), 914 So.2d 1168, provides an example of a case where the court suppressed evidence collected during a protective sweep. In Ledford , the sheriff's office received a call from a motorist reporting a fight in the front yard of a residence. Deputies went to the address and approached a woman in the front yard with blood on her chin, but no visible cuts or bruises. The woman told deputies the defendant ran into the woods when he saw the police officers approaching. Deputies asked to go into the home, but the woman denied entrance. Deputies decided to enter the home without consent to conduct a protective sweep to ensure the defendant was not inside to harm the woman or deputies. When they entered, they found marijuana in plain view.
The trial court found the officers lawfully entered the home to ensure the defendant was not hiding there. The State argued that the search of defendant's residence was constitutionally valid under the plain view and exigent circumstances exceptions to the warrant requirement. However, the appellate court determined that the plain view exception was inapplicable as the deputies were not lawfully in the place from which the contraband was viewed. Id. at 1172. It further determined that entry into defendant's residence, without a warrant or consent, to conduct a protective sweep was not justified by any reasonable articulable suspicion that defendant was inside of the residence or that, even if present, he would have been any danger to anyone at the scene. Id. at 1177. The appellate court suppressed the evidence because the State failed to meet its burden of proving the protective sweep of the residence was justified pursuant to one of the exceptions to the warrant requirement. Id.
Furthermore, in a federal case involving a knock and talk, United States v. Wyatt , 2012 WL 1071946, 2012 U.S. Dist. Lexis 42725 (W.D. Ky. 3/28/12), officers received a complaint that defendant was running a meth lab at a residence. Upon surveilling the home, they learned that the owner of one of the vehicles parked at the home had purchased a large, but legal amount of pseudophedrine, often used to make meth. Defendant's name also came up during the search of another suspected drug house. Officers decided to go to the house and talk to the defendant. When they arrived, they encountered two other individuals in the front of the house performing yard work. Officers asked where the defendant was, the two individuals responded that he was not home, and officers asked them to call defendant. One of the officers then began to perform a protective sweep to make sure no one else was at the residence. During the sweep, he went around to the back of the residence and observed items used in a meth lab in the backyard. The court set forth the following reasons when determining that the protective sweep was not warranted by the circumstances:
Considering Detective Travis's and Alexander's testimony regarding their articulated safety concerns, the Court finds that the protective sweep performed by Detective Travis was not reasonable under the circumstances. Detective Travis and Alexander have not articulated facts that would warrant a reasonably prudent officer to believe that the area to be swept harbored an individual posing a danger to those on the scene. Alexander testified that Joe and Dalton Wyatt told him that Defendant was not there, and that "[they] took their word for it." Alexander and Detective Travis believed that Defendant was not there, as evidenced by their own testimony and their failure to *1182 knock on the front door of the home. Thus, the fact that Defendant was known to carry weapons in the past is not a sufficient reason to perform the protective sweep. Additionally, Detective Travis testified that he did not know if any other individuals were present but that he performed the protective sweep to find out. Although there were cars present on the property, the officers could not detect the presence of any other individuals. Importantly, even if they detected the presence of others, there is no evidence that other individuals would pose a danger to the officers. Cf. United States v. Stover , 474 F.3d 904, 910-12 (6th Cir. 2007) (officers observed two cars parked in driveway of duplex-one registered to the defendant and the other to a local criminal who resided at a different address-and heard noises and movement in the house before the defendant came downstairs). Accordingly, the government has not met its burden of providing sufficient facts to support a reasonable belief that a third party was present on the premises who posed a danger to the officers. Thus, Detective Travis's warrantless sweep of the curtilage of the home was not justified.
Id. at *10, 2012 U.S. Dist. Lexis 42725 at pp. 31-32
In the instant matter, the facts do not support the officers' decision to enter Cowans' backyard to conduct a protective sweep. Prior to approaching the residence, officers did not witness the exchange of any drugs and their CI was not involved in the purchase of any drugs. Rather, officers obtained information from their CI that defendant was a drug trafficker and indicated he could deliver drugs to the CI from Houston. Officers observed defendant visit the Fox Lane residence for a brief period of time on two occasions. During the traffic stop of defendant's truck, officers found items that are used by drug traffickers to mask the odor of drugs, but located no drugs in the truck.
Officers did not possess any information regarding the individuals residing at the Fox Lane residence, but suspected the home was possibly a stash house for drugs. Therefore, based on their suspicions, officers decided to conduct a knock and talk. Officers agreed they did not possess probable cause to obtain a search warrant. After officers knocked on Cowans' door, he exited a neighboring property and identified himself. Cowans denied officers' request to enter his home and told officers they could talk in the front yard. Cowans told officers no one else was present at the residence and officers testified that they had no reason to believe otherwise.
Sgt. Walsh testified that he did not obtain consent from Cowans to enter the backyard or the garage to conduct the protective sweep. He further testified that he was not in fear for his safety and that it was standard operating procedure to conduct a protective sweep, particularly in a narcotics investigation. Officers did not testify to any facts creating an exigent situation that would justify officers' entry into Cowans' backyard. Officers further failed to testify to any specific knowledge that additional individuals would be in the backyard or the house to raise concerns of officer safety. Officers cannot encroach upon the Fourth Amendment protections based solely on their belief that narcotics may be involved, particularly when officers have no surveillance or other evidence to establish that drug trafficking actually occurred at the suspected location. Furthermore, as explained above, officers cannot create exigent circumstances by deciding to conduct a knock and talk. The Court understands law enforcement's zeal. However, the quantity of *1183 illegal narcotics seized does not retroactively supply probable cause or obviate the need for a search warrant.
In sum, the facts of this case do not show the entry into Cowans' backyard, without a warrant or consent, to conduct a protective sweep was justified by any reasonable articulable suspicion that someone would be in the backyard or that, even if present, would be any danger to anyone at the scene. We find that the state failed to meet its burden of proving that the protective sweep of the garage was justified pursuant to one of the exceptions to the warrant requirement. Accordingly, we find that the preponderance of the evidence clearly favors granting defendant's motion to suppress the evidence and statements resulting from the improper protective sweep.
DECREE
For the following reasons, we reverse the trial court's denial of defendant's motion to suppress and enter an order granting the motion to suppress evidence and statements. We vacate defendant's conviction and sentence and remand the matter to the trial court.
RULING ON MOTION TO SUPPRESS REVERSED; MOTION TO SUPPRESS EVIDENCE AND STATEMENTS GRANTED; CONVICTION AND SENTENCE VACATED; REMANDED
GRAVOIS, J., DISSENTS WITH REASONS
GRAVOIS, J., DISSENTS WITH REASONS
I agree with the majority's opinion that the traffic stop of defendant, Juan Salinas, and his continued detention were lawful. However, for the following reasons, I respectfully dissent from the majority's opinion that the trial court erred in granting the motion to suppress. In my opinion, under the particular facts and totality of the circumstances presented, the officers acted reasonably, based on rational inferences from the facts presented, and were thus justified in conducting the protective sweep for officer safety of the inside of Mr. Cowans' residence, behind his residence, and in the open garages behind his residence.
In United States v. Howard , 106 F.3d 70, 73-75 (5th Cir. 1997), the U.S. Fifth Circuit Court of Appeals upheld a finding that exigent circumstances justified a warrantless entry into the home of a suspected drug dealer. In that case, DEA agents had credible information that the defendant's house was a stash house. A month later, DEA agents arrested an individual coming out of the defendant's house who agreed to cooperate with the agents and who advised the agents that the defendant was storing drugs in the house and that the defendant expected him to return to the house with a kilogram of cocaine. The court held that even though there was no evidence that the defendant posed a specific threat to officers, the warrantless entry into his house was justified based on officer safety because of the fact that drug traffickers often possess and use guns. Specifically, the court found that "[a]lthough our review of the record reveals that there was no direct or circumstantial evidence supporting [the officer's] belief that [the defendant] or anyone else who may have been with [the defendant] posed any specific danger to [the officer], the officers, or the community at large, the absence of a particularized fear (at least in our Circuit) is not controlling," noting that "[a]t the hearing, [the officer] repeatedly stated that he had no knowledge that [the defendant] had weapons or that [the defendant] was a violent person." Id. at 75.
*1184 Further, this Court's opinion in State v. Doussan , 05-586 (La. App. 5 Cir. 2/14/06), 924 So.2d 333, is instructive. In Doussan , this Court upheld the denial of a motion to suppress evidence that was discovered during a protective sweep of a music studio. Based on information from a confidential informant ("CI") who had purchased marijuana at the studio from the owner (the defendant) in the past that a fresh supply was available, officers applied for a search warrant. Prior to issuance of the warrant, officers set up surveillance of the studio around 9:00 p.m. from around a block away and instructed the CI to return to make a purchase. The CI made the purchase, which field tested positive. The surveillance team witnessed three other people enter and leave the studio, one of whom was stopped and found to be in possession of marijuana. The surveillance team witnessed the owner repeatedly walking in and out of the studio as if he were nervous. After a fourth man arrived, officers became concerned defendant might destroy evidence, fearing that one of the visitors may have alerted defendant to the surveillance, as well as they did not have the manpower to handle all of the foot traffic at the studio. The supervising officer ordered officers to secure the premises.
Officers approached the defendant, who was outside the studio with the fourth man, with guns drawn. The defendant fled inside the studio, locking the door. Officers pounded on the door, whereupon the defendant unlocked it, allowing the officers to enter. They performed a pat down search of his person and a protective sweep of the studio, during which they observed marijuana in plain view. Minutes after the studio was secured, officers received notice that the search warrant had been signed (around 9:45 p.m.), which arrived 10-15 minutes later.
The defendant argued that the protective sweep was not justified, since the surveillance officers should have known, having observed the comings and goings from the studio, that there was no one inside the studio, and that there was no need for a protective sweep of the premises to search for accomplices. This Court upheld the protective sweep, however, on the basis that the surveillance lasted only about 45 or 50 minutes, and the officers "could not have known whether anyone entered [the studio] before the surveillance began." State v. Doussan , 924 So.2d at 342-43. Thus, this Court found that "the officers were justified in conducting a protective sweep of the premises for their own safety, and to prevent the destruction of evidence." Id. at 343.
Similarly, in the present case, because the officers had not conducted surveillance of Mr. Cowans' residence on Fox Lane prior to arriving there, they could not have known whether anyone other than Mr. Cowans was either inside of the residence, behind the non-fenced-in residence, or in the open garages behind the residence. When Lt. Shuff was specifically asked if he knew whether any other people were present on the property, he stated that he did not know one way or the other. And although the officers were advised by Mr. Cowans that no one else was present at the home at that time, under the circumstances presented to the officers at that time, they had no way of knowing whether Mr. Cowans was being truthful with them in so stating at that time. Further, as argued by the State, the totality of the evidence shows that at the time of the protective sweeps, the officers were investigating serious and substantial allegations of narcotics trafficking at Mr. Cowans' residence, that by its very nature, narcotics investigations present dangerous circumstances to officers, and that the officers had credible evidence that on an earlier *1185 occasion, numerous subjects known to be involved in narcotics trafficking had, in fact, been present at 836 Fox Lane, which they credibly suspected was a stash house for illegal narcotics, so as to justify the protective sweeps on the date in question. Accordingly, in my opinion, under the particular facts and totality of the circumstances presented, based on rational inferences from the facts presented, the officers acted reasonably and were thus justified in conducting the protective sweep for officer safety of the inside of Mr. Cowans' residence, behind his residence, and in the open garages behind his residence.[9]
I agree with the majority, however, that protective sweeps are not permissible simply as a matter of "routine procedure" or "common practice" for officer safety. Rather, the facts and circumstances of each particular case must clearly justify that the protective sweep in question was conducted for actual officer safety purposes, based on rational inferences from the facts presented, as was the case here, in my opinion.
For the foregoing reasons, I respectfully dissent. I would uphold the validity of the warrantless search of Mr. Cowans' premises and affirm defendant's conviction and sentence.

La. C.Cr.P. art. 914(A) provides a "motion for an appeal may be made orally in open court or by filing a written motion with the clerk. The motion shall be entered in the minutes of the court."

No witness testified regarding the results of the canine's open-air sniff of the vehicle.

Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The title to the 836 Fox Lane residence entered into evidence indicated Cowans was the owner of the property.

Lt. Shuff also agreed on cross-examination that the officers had no reason to believe anyone else was behind the residence posing a danger. He testified that it was general procedure for officer safety to conduct a protective sweep during a "knock and talk" such as this.

The photographs introduced into evidence are blurry. Sgt. Walsh acknowledged that his camera was not functioning well, and the more photos he took, the poorer the quality became.

Agent Carcabasis testified that the lot was approximately 60 feet wide by 120 feet deep, and had a driveway that went to the front of the residence, but not around back to the garage/shed area.

The State does not challenge the assertion that the open garage was curtilage of a home, which falls under Fourth Amendment protections. The State only contends that the protective sweep of the property was lawful. The curtilage of a home is that "area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life."United States v. Dunn , 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) ; State v. Raborn , 33,980 (La. App. 2 Cir. 11/15/00), 771 So.2d 877, writ denied , 00-3414 (La. 11/2/01), 800 So.2d 868. It is considered part of the home itself and is therefore afforded Fourth Amendment protection. Id. To determine whether an outside area is part of the curtilage, or extension of the residence's living area, courts look at four factors which indicate how intimately the area is tied to the home itself: (1) the area's proximity to the home; (2) whether the area is included within an enclosure surrounding the home; (3) whether the area is being used for the intimate activities of the home; and (4) the steps taken by the resident to protect the area from observation by passers-by. Id.
The garage at issue was located directly behind the home and used to store cars, tools and other equipment. The backyard and garage were within the curtilage of the residence and, thus, subject to Fourth amendment protections.

See also State v. Hilton , 16-0325 (La. 3/24/16), 187 So.3d 981, 982-83 (per curiam ), in which the Louisiana Supreme Court reversed the trial court's ruling suppressing evidence seized following the execution of a search warrant predicated upon drug and firearm evidence observed during a protective sweep. The trial court found that the officers trespassed prior to obtaining the warrant when they went to a side door to knock and announce their presence and as a result, the search warrant based on drug and gun evidence obtained afterwards was fruit of the poisonous tree. In reviewing the evidence presented, the Supreme Court found that the officer standing at a front door which was chained shut with a lock affixed detected the smell of marijuana which prompted the officers to further investigate and discover an open and accessible side entrance. Upon knocking and announcing their presence, the earlier smell of marijuana, and the continuing commotion of people the officers could only dimly see once the door was opened, the court found that the officers were reasonable in directing the individuals to exit, detaining them, and conducting a protective sweep. The court found that "[b]ecause the police were unsure if all occupants had actually exited, the sweep was justified for officer safety and to prevent evidence from being destroyed." Id. at 983. Thus, it held that "[t]he search warrant, which was predicated upon drug and firearm evidence the police observed during the protective sweep, was thus not tainted by an unconstitutional search." Id.